# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WESLEY GAMBLE, | ) |
| *Plaintiff,* | ) |
| v. | ) No. 18 C 4520 |
| FIAT CHRYSLER AUTOMOBILES, | ) Judge Virginia M. Kendall |
| *Defendant.* | ) |

## MEMORANDUM ORDER AND OPINION

Plaintiff Wesley Gamble was an employee of Defendant Fiat Chrysler Automobiles ("FCA") at FCA's manufacturing plant in Belvidere, Illinois from 2015 to 2017. After FCA terminated his employment, Gamble sued FCA, alleging that his termination was motivated by racial discrimination in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981, disability discrimination in violation of the Americans with Disabilities Act ("ADA"), and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). (Dkt. 9.) FCA now moves for summary judgment on all counts. For the reasons set forth below, FCA's Motion for Summary Judgment (Dkt. 80) is granted.

## BACKGROUND

Wesley Gamble is an African-American male who was 63 years old at the time of his termination from FCA in 2017. (Dkt. 100 ¶ 2.)[1] He worked at the Belvidere plant from May 12,

---

[1] FCA did not file any response to Plaintiff's Rule 56.1 Statement of Additional Facts. (Dkt. 101.) Instead, FCA only filed a Motion to Strike the statement of additional facts on the basis that some of the statements of fact rely on deposition testimony from a different case. (Dkt. 106; Findlay Dep., Dkt. 101-3.) To the extent that Plaintiff's alleged facts do rely on outside depositions, the Court will not consider them for purposes of this Motion. *See* Fed. R. Civ. P. 32(a)(8) ("A deposition . . . may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action."). However, all other facts alleged in Plaintiff's Statement of Additional Facts are deemed admitted for purposes of this Motion due to

1

2015 until October 11, 2017. (*Id.* ¶ 5.) FCA initially hired Gamble as a shift manager in the assembly unit. (*Id.* ¶ 7.) In that role, Gamble reported to a Caucasian unit manager named Mark Kreusel. (*Id.*; Dkt. 101 ¶ 2.) Following an internal reorganization, FCA reassigned Gamble to serve as a Production Supervisor. (Dkt. 100 ¶ 8.) In that new position, Gamble reported to Ted Whitfield. (*Id.*)

During Gamble's onboarding process at FCA, he received a copy of FCA's Discrimination and Harassment Prevention Policy ("Policy 3-6"). (*Id.* ¶ 9.) Policy 3-6 requires employees to do their part to create a workplace that is free of discrimination and harassment based on race, age, disability status, etc. (*Id.* ¶ 10.) Under Policy 3-6, whether conduct constitutes harassment may depend on whether it is viewed as offensive by the individual who is the subject of the conduct. (*Id.* ¶ 13.) The policy also provides for an internal investigative procedure by which FCA can investigate allegations of discrimination or harassment and take appropriate disciplinary actions in response, including termination. (*Id.* ¶ 15.) At the time of his hiring, Gamble also signed a contractual limitations agreement, which provided that any employment-related claims that need not first be submitted to the EEOC must be filed within 180 days of the adverse employment action on which the suit is based. (*Id.* ¶ 6.)

## I. First Allegations Against Gamble

On or about October 26, 2015, Jeanne Ellis, an hourly employee who was Gamble's subordinate, filed a complaint about Gamble with FCA alleging that he harassed her in violation of Policy 3-6. (*Id.* ¶ 17.) Another FCA employee, Susana Camacho, made similar allegations of harassment. (*Id.* ¶ 19.) Kelly Pollard, a Caucasian female from FCA Human Resources

---

FCA's failure to respond pursuant to Local Rule 56.1. ("All material facts set forth in the statement filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party.")

investigated the complaints by Ms. Ellis and Ms. Camacho. (*Id.* ¶ 20; Dkt. 101 ¶ 1.) According to Pollard, her investigation centered around Ellis's and Camacho's complaints that Gamble made comments of a sexual nature that they found to be harassing. (Dkt. 82-4 at p. 29:16–20.) As part of the investigation, Pollard and some of her HR colleagues interviewed witnesses and took statements from them. (Dkt. 100 ¶ 23.) At the conclusion of the investigation, FCA issued Gamble a written warning explaining that he had violated Policy 3-6. (*Id.* ¶ 25.) He signed the warning indicating that he received it and that FCA was requiring him to take FCA's R.E.S.P.E.C.T. training. (*Id.*) Gamble admits that he has no evidence that his age, race, or disability status played any role in the warning he received, and he is not aware of any FCA employees who were accused of similar conduct who were not disciplined. (Dkt. 82-1 at p. 81.)

## II. Performance Evaluation

Mark Kreusel conducted Gamble's 2016 annual evaluation and found Gamble's performance to be unsatisfactory. (Dkt. 100 ¶¶ 30, 32.) As a result of this unsatisfactory evaluation, FCA put Gamble on a performance improvement plan in early 2017. (*Id.* ¶ 34; Dkt. 101 ¶ 8.) Gamble contends that his age, race or disability impacted his performance evaluation, but he admits that this is speculation on his part. (Dkt. 100 ¶ 35.) Following successful completion of his performance improvement plan, Gamble had no additional performance issues. (Dkt. 82-4 at pp. 47:21–48:2.)

## III. Gamble's Medical Conditions

In 2013, Gamble was diagnosed with prostate cancer. (Dkt. 101 ¶ 3.) He was later diagnosed with cancer of the lymph node. (*Id.* ¶ 4.) Gamble took two weeks off of work in June 2017 after having surgery to treat this cancer. (*Id.* ¶ 5; Dkt. 100 ¶ 36.) When he returned to work, he was able to perform his work functions, but his energy levels and appetite were noticeably lower

and he was in pain. (Dkt. 100 ¶ 37; Dkt. 101 ¶ 7.) Once he had recovered from the procedure, his condition did not restrict him from carrying on normal life activities. (Dkt. 100 ¶ 38.) The only person at FCA who knew about Gamble's cancerous condition was Ted Whitfield, a shift manager who has since passed away. (*Id.* ¶ 39.) Gamble does not know whether Whitfield told anyone else about his condition or whether anyone else at FCA was aware of his condition, but he believes that Kreusel would have approved his time-off request. (*Id.* ¶¶ 40, 41; Dkt. 101 ¶ 6.) Gamble does not know whether his condition was causally related to his termination. (Dkt. 100 ¶ 42.)

IV. **Second Set of Allegations Against Gamble**

On or about August 31, 2017, Pollard commenced an investigation into allegations against Gamble by one of his female co-workers, Shareea Smithson. (*Id.* ¶ 43.) Pollard took a statement from Shareea Smithson in which she explained that Gamble made unwanted sexual comments, including suggesting that she should have a child with him. (Dkt. 101-4 at p. 8.)[2] She also alleged that Gamble got too close to her on another occasion, making her feel uncomfortable. (*Id.*) Bennie Williams III, an African-American shift manager, gave a statement to Pollard in which he explained that he witnessed Gamble get too close to Smithson and that he had been made aware that Gamble directed inappropriate comments toward her. (*Id.* at pp. 12–13.) As part of the investigation into Smithson's allegations, Pollard also interviewed Melinda Bonte and Fonshay Potter, two female production supervisors. (Dkt. 100 ¶ 45.) Ms. Potter explained that she once overheard Gamble tell Smithson that "somebody needs to get behind you" as Smithson was leaning over a desk in a meeting room. (*Id.* ¶ 48.) Bonte also reported to Pollard that Gamble used to look

---

[2] Gamble objects to FCA's use of this statement (and several others) because it was not signed by Ms. Smithson, in violation of FCA's regular HR practices. That is an objection that goes to the weight of the evidence, not to whether the Court should consider it for purposes of this Motion. Morevoer, Gamble's only support for the proposition that FCA's policy was to have witnesses sign their statements is deposition testimony from a different lawsuit (Dkt. 101-3), which the Court cannot consider for purposes of this Motion. *See* Fed. R. Civ. P. 32(a)(8).

4

at Bonte's breasts and made remarks to her that she perceived as sexual innuendo. (Dkt. 101-4 at p. 2.) Pollard initially testified that all of the witness statements she took as part of her investigation were signed by the witnesses; she later corrected her testimony, explaining that only one of the witness statements was signed. (Dkt. 82-6 ¶ 25.)

Pollard interviewed Gamble as part of her 2017 investigation, and he denied all wrongdoing, explaining that the allegations were either false or taken out of context. (Dkt. 101 ¶ 13.)

Pollard's investigation concluded on September 26, 2017 with Pollard preparing a written report finding that Gamble had committed a second violation of Policy 3-6. (Dkt. 100 ¶ 53.) The report recommended that Gamble be terminated. (*Id.*) Pollard believed the statements made by all of the witnesses during the course of the investigation were truthful, and she testified that she had no reason to believe that any witness had an improper motive against Gamble. (Dkt. 82-6 ¶ 16.) Despite Gamble's request that Pollard interview several individuals as part of the investigation, Pollard's investigation report does not indicate that she interviewed any of the individuals that Gamble requested. (Dkt. 100 ¶ 55; Dkt. 82-4 at p. 64.) Specifically, Gamble requested that Pollard speak with Ben Gorde, Stephen Branch, Bonneville Jones, Nate Allison, and Latoya Webber. (Dkt. 101 ¶ 15.) Pollard did not interview any of these people as part of her investigation; another member of the HR team interviewed Gorde, but no statement was written up for Gorde. (Dkt. 101 ¶ 18; Dkt. 82-4 at p. 59.)

During the course of this investigation, Gamble spoke with Latoya Webber, another FCA employee, and, according to Gamble, she told Gamble that she overheard Smithson and Bonte in

5

the restroom saying that "we got him." (Dkt. 100 ¶ 58.) Latoya believed they were referring to Gamble.[3] (*Id.*)

V. **Gamble's Termination**

On October 11, 2017, FCA terminated Gamble's employment during a meeting attended by Kelly Pollard and Bennie Williams. (*Id.* ¶ 62.) Pollard signed the letter to Gamble explaining that FCA terminated his employment effective October 11, 2017. (Dkt. 1-1.) According to Pollard, FCA terminated his employment because he committed a second violation of Policy 3-6. (Dkt. 82-4 at p. 48.)

FCA subsequently filled Gamble's vacant position with Eddie Webber, a 57 year-old African-American male who already worked for FCA in a different capacity. (Dkt. 100 ¶ 77.) Pollard is aware of at least one case in which FCA did not fire a white, salaried employee after FCA found the employee, Rick McAndrew, had violated Policy 3-6 by committing sexual harassment. (Dkt. 82-4 at pp. 54–55.)[4]

**LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the

---

[3] The Court notes that these statements are hearsay on hearsay, but because they could possibly be presented at trial in a non-hearsay fashion, the Court considers them for purposes of the instant Motion.

[4] Gamble alleges that several non-black salaried employees were not fired after having committed Policy 3-6 violations (Dkt. 101 ¶ 25), but there is only one example of this supported by proper citations to the record of *this* case.

non-moving party and draw all reasonable inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 255; *see also Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018). However, "'inferences that are supported only by speculation or conjecture will not defeat a summary judgment motion.'" *Herzog v. Graphic Packaging Intern., Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008)).

## DISCUSSION

### I. Abandoned Claims

Gamble does not now oppose summary judgment on his ADEA, ADA, or Section 1981 claims; he only continues to contest summary judgment on the Title VII racial discrimination claim. (Dkt. 99 at p. 2 n.1.) When a plaintiff fails to defend a claim in response to a motion for summary judgment, the Court may deem the claim abandoned. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (explaining that failure to defend a claim in a summary judgment response brief constitutes abandonment); *Palmer v. Marion Cty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (explaining that the district court was justified is deeming a claim abandoned where the plaintiff failed to delineate a claim in his brief in opposition to summary judgment). FCA is entitled to summary judgment by abandonment with respect to the ADEA and ADA claims. The Court does not deem the Section 1981 claim abandoned, however, because there is substantial overlap between the Title VII racial discrimination claim and the Section 1981 claim.

Even if Gamble had not abandoned his ADEA and ADA claims, the Court notes that Gamble has not established a sufficient factual basis for a jury to find that FCA violated either of those statutes. Gamble has failed to make out a *prima facie* ADEA claim because Gamble's replacement was only six years younger than Gamble at the time of Gamble's termination. *See*

*Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 892–93 (7th Cir. 1997) (explaining that a ten-year gap in ages between the terminated employee and his replacement is a presumptively substantial difference such that it would be sufficient to establish a *prima facie* case of age discrimination, but a difference of six or seven years is presumptively insubstantial). If, despite the small age gap, Gamble could nonetheless demonstrate that his termination was motivated by his age, he could still make out a *prima facie* ADEA claim. *See id.* at 893 (explaining that the ten-year line is "not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiff's age"). But Gamble has cited no evidence in the record to suggest that FCA's decision to terminate him was motivated by his age. Gamble has likewise failed to make out a *prima facie* ADA claim because he has presented no evidence to suggest that his termination was related to either of his cancers or his recovery from cancer surgeries and treatments.

## II.     Racial Discrimination Claims

### A.     Section 1981 Racial Discrimination Claim

Plaintiffs are not required to first file EEOC charges prior to bringing Section 1981 claims. *Fane v. Locke Reynolds*, 480 F.3d 534, 539 (7th Cir. 2007). The 180-day contractual limitations clause to which Gamble agreed applies to all claims that need not first be filed with the EEOC. (Dkt. 81 at p. 14.) That agreement therefore governs Gamble's Section 1981 claim. FCA terminated Gamble on October 11, 2017, and he filed this lawsuit on June 28, 2018, more than 180 days after FCA fired him. This claim is therefore time-barred. Because the claim is time-barred and because Gamble does not oppose summary judgment on this count, FCA is entitled to judgment as a matter of law as to the Section 1981 racial discrimination claim.

**B.     Title VII Racial Discrimination Claim**

Title VII forbids employers from taking any adverse employment action against an employee on the basis of the employee's race. 42 U.SC. § 2000e-2; *Naficy v. Ill. Dept. of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012). To determine whether a plaintiff has a viable discrimination claim, this Court asks whether all the evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race caused his discharge. *See Ortiz v. Werner Enter.*, 834 F.3d 760, 765 (7th Cir. 2016). To establish a *prima facie* case of discrimination, a plaintiff must offer evidence that (1) he is a member of a protected class, (2) he performed his job duties to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) his employer treated similarly situated individuals who were not members of his protected class more favorably. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). If a plaintiff successfully makes out a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for an adverse employment action. *Id.* If the defendant does so, then the burden shifts back to the plaintiff to show that the employer's articulated reason is pretextual, "which in turn permits an inference of unlawful discrimination." *Id.* "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). To survive a motion for summary judgment, a plaintiff "must provide evidence from which a reasonable jury could conclude that the reasons [the employer] gave for [the employee's] termination were a deliberate falsehood." *Davenport v. Northrop Grumman Sys. Corp.*, 281 F'Appx. 585, 588 (7th Cir. 2008). If the decisionmaker honestly believes the reasons given for taking an adverse employment action, pretext does not exist. *Little*, 369 F.3d at 1012.

Gamble has established the first three elements of a *prima facie* case of discrimination. There is no dispute that: (1) as an African-American, he is a member of a protected class, (2) at the time of his discharge, he had already successfully completed a performance improvement plan and had no ongoing job performance issues, and (3) he was discharged, which is a quintessential form of adverse employment action.

The record is less clear about whether Gamble satisfied the fourth element of the *prima facie* case, whether FCA treated similarly situated non-black employees more favorably. For purposes of a Title VII race discrimination claim, "similarly situated" employees are those who are "directly comparable" to the plaintiff "in all material respects." *Brummet v. Sinclair Broad. Group., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). Gamble contends that "multiple non-black salaried employees at the [Belvidere] plant [were] accused of violating Defendant's 3-6 Policy and not terminated." (Dkt. 101 ¶ 25.) In support of this contention, however, he cites to evidence outside the record of this case, which, as explained above, the Court cannot consider for purposes of this Motion. The only proper evidence to which Gamble cites for the proposition that any similarly situated non-black employee was treated more favorably is a passage from Pollard's deposition in which she explained that Rick McAndrew, a white employee, violated Policy 3-6 by committing sexual harassment and was not discharged. (Dkt. 82-4 at pp. 54–55.) But the record does not indicate whether McAndrew, like Gamble, had been found to have violated Policy 3-6 more than once. FCA did not discharge Gamble the first time that he committed a Policy 3-6 violation, so if McAndrew also was not fired after his first offense, it cannot be said that FCA treated Gamble any differently than it treated McAndrew. In other words, the record does not indicate whether McAndrew and Gamble were similarly situated in all material respects, including whether they were both two-time violators of Policy 3-6. Nor does the record indicate whether, like Gamble,

McAndrew had multiple allegations against him from various employees, corroborated by third party witnesses. On this record, Gamble has failed to establish that FCA treated a similarly situated non-black employee more favorably than they treated him.

Even if Gamble could make out a *prima facie* case of racial discrimination, FCA has a legitimate, non-discriminatory reason for terminating his employment; namely, that he had repeated allegations from several women alleging violations of company policy. Gamble opines that Pollard performed her investigations in a biased fashion, pointing to the fact that witness statements were unsigned and that HR did not interview some individuals that Gamble requested. According to Gamble, that Pollard conducted the investigation in this fashion suggests that FCA's decision to fire him on the basis of his Policy 3-6 violations was actually pretext for racial discrimination. But no reasonable jury could conclude that multiple allegations from various women about unwelcome workplace conduct, which were corroborated by third party witnesses, all amounted to a lie contrived to mask unlawful discrimination. Gamble has pointed to no authority to suggest that an employer's investigation is unlawful if the employer chooses not to interview certain individuals whose testimony the employer deems immaterial to the investigation. *C.f. Little*, 369 F.3d at 1013 (describing the plaintiff's argument that an investigation into workplace allegations was "so shoddy as to give rise to an inference of discriminatory intent" as "a nonstarter"). Pollard testified that she interviewed all relevant witnesses, and another HR employee interviewed Ben Gorde, as Gamble had requested. In short, Pollard conducted a reasonable investigation of the allegations brought against Gamble and honestly concluded that Gamble's conduct warranted his termination. Because she reached this honest belief after interviewing multiple individuals with relevant information, no reasonable jury could conclude that her decision to recommend his termination was pretextual. Even if Smithson or Bonte had

some ulterior motive for making allegations against Gamble, because Pollard honestly believed the allegations, FCA's decision to terminate Gamble cannot be considered pretextual. FCA is therefore entitled to summary judgment on the Title VII racial discrimination claim.

## CONCLUSION

Gamble has failed to make out a *prima facie* case of racial discrimination because he has not shown that FCA treated any similarly situated non-black individual differently. Even if he could make out a *prima facie* case, FCA had a legitimate, non-discriminatory, and non-pretextual reason for firing him. FCA is therefore entitled to summary judgment as to the Title VII racial discrimination claim. Gamble's Section 1981 claim is time-barred, and he abandoned the remainder of his claims. FCA's Motion for Summary Judgment [80] is granted.

_____
Virginia M. Kendall
United States District Judge

Date: March 25, 2020